IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANN M. JENKINS,                          )
                                         )
            Plaintiff,                   )
                                         )
     v.                                  )          CIVIL ACTION NO. 1:10cv402-SRW
                                         )
MICHAEL ASTRUE,                          )
Commissioner of Social Security,         )
                                         )
            Defendant.                   )

## MEMORANDUM OPINION

Plaintiff Ann M. Jenkins brings this action pursuant to 42 U.S.C. § 405(g) and

§ 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying her applications for a period of disability and disability insurance

benefits and for supplemental security income under the Social Security Act. The parties

have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C.

§ 636(c). Upon review of the record and briefs submitted by the parties, the court concludes

that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

On April 9, 2004, plaintiff – who was then forty years old – sought treatment from her

primary care physician, Dr. Niel C. Rasmussen, complaining that her left visual field "comes

and goes on her" and had been doing so for the previous two weeks. She reported that it

"stays out" for a few minutes, and she has no facial symptoms or weakness anywhere else.

Dr. Rasmussen assessed visual disturbance. He referred plaintiff to an ophthalmologist and

told her to follow-up in five to seven days if her symptoms did not improve.  (R. 170-171).

A few weeks later, plaintiff had a brain MRI.  It showed "no acute intracranial abnormality"

and only "borderline Chiari I Malformation." (R. 195; see R. 168).  Plaintiff also had a

bilateral carotid ultrasound which was found to be "[n]ormal."  (R. 194).

     Plaintiff next returned to Dr. Rasmussen almost a year later, on April 5, 2005.  She

reported that she had passed out two weeks previously, associated with gastrointestinal

illness, and had gone to the emergency room for evaluation.  She reported having intermittent

left-sided chest pain, some palpitations, and fatigue with exertion.  Dr. Rasmussen ordered

an EKG, which he determined was abnormal.  (R. 170, 197).  He diagnosed malaise and

fatigue, chest pain (possibly due to GERD), and an abnormal EKG.  He scheduled plaintiff

for a graded exercise test and scheduled her for a four week follow-up appointment.

(R. 170).  The graded exercise test was conducted on April 15, 2005, and was a negative

stress test with "no significant reversible ischemia and with normal ejection fraction of 59%."

(R. 196).

     On November 3, 2007, at about noon, plaintiff arrived at the Southeast Alabama

Medical Center Emergency Room by ambulance after her daughter reportedly witnessed her

losing consciousness and shaking all over.  The intake nurse circled "none" in the "injury"

block, and included no indication that plaintiff bit her tongue or had lip or mouth injury.

(R. 207). Plaintiff had an EKG, chest x-ray and head CT scan which were all normal.

(R. 208, 221-224). The ER physician diagnosed "transient LOC [loss of consciousness]:

syncope vs seizure." (R. 208).  Plaintiff was discharged from the ER at 2:45 p.m. with instructions to follow up with Dr. Rasmussen within three days and to refrain from driving until cleared by her primary doctor.  (R. 205, 212).

Plaintiff reported to Dr. Rasmussen for follow-up on November 5, 2007.  She told the doctor that she had gone to the emergency room the previous weekend, after she was witnessed having a convulsion.  (R. 167).  Dr. Rasmussen ordered an EKG, which showed "[n]ormal sinus rhythm with possible short p-r interval and ectopic beats."  (R. 167-68).  Dr. Rasmussen diagnosed syncope (possible seizure) and abnormal EKG.  He scheduled plaintiff for an appointment with Dr. Sher Ghori, a neurologist.  (R. 168).

Plaintiff saw Dr. Ghori on November 14, 2007.  She told him that she was "found by her daughter ... unconscious on the floor." (R. 241).  She stated that she had bitten her tongue and that the event was not witnessed. (R. 241).  Dr. Ghori found no abnormalities on physical examination.  Dr. Ghori assessed "[p]robable seizure," stating:

> [I]t is not clear if this was partial with secondary generalization or this was convulsive syncope. Her neurological evaluation is normal as is the neuroimaging which is obviously good prognostic factors but she has two sons who have epilepsy as well as her mother['s] side has the seizures. This obviously puts her in risk for seizures.  Even though she had a normal MRI in 2004, but I think we need to repeat that because of the new clinical event and we will recommend the ambulatory EEG.  If the above tests are unremarkable, then I would not start on her on any anticonvulsant agent until there is a recurrence.  However, she will have to observe the seizure precautions until free for six months.

(R. 243).  Plaintiff had the brain MRI the following week, on November 21, 2007. The radiologist concluded that it revealed "non-specific minimal signal elevation gathered in deep

3

white matter both hemispheres of uncertain significance. This could represent early small vessel chronic ischemic change or demyelinating process." He recommended that the MRI results be correlated clinically.  (R. 245).  The same day, plaintiff also had a portable EEG. The EEG was supposed to be a 24-hour recording, but a period of only one hour and nineteen minutes was recorded. During that period, no focal or epileptic seizures were shown.  (R. 255).

On November 29, 2007, plaintiff presented to Dr. Michael Pinson, a cardiologist. (R. 260-62). Dr. Pinson found no abnormalities on physical examination.  However, he noted abnormalities on plaintiff's EKG. He diagnosed "[c]hronic non-sustained ventricular ectopy." (R. 261).  Dr. Pinson scheduled a Cardiolite graded exercise test and an echocardiogram.  He prescribed a twenty-four hour Holter monitor "to rule out evidence of significant or sustained ventricular dysrhythmias.  (R. 261-262). On December 5, 2007, plaintiff returned to Dr. Ghori for follow-up of the MRI and EEG.  The record for that visit includes no notes from the physician. (R. 240).

On December 12, 2007, plaintiff completed the echocardiogram and graded exercise test scheduled by her cardiologist. The graded exercise test was negative, and the echocardiogram documented normal left ventricular systolic function, except for "mild/minimal mitral valve prolapse" which was not clinically significant. (R. 247-251, 259). In a follow-up visit with Dr. Pinson four days after the testing, plaintiff reported "a recurrent seizure" and indicated that she was scheduled to see Dr. Ghori.  Dr.  Pinson concluded:

> [Plaintiff's] non-sustained ventricular ectopy is not likely primarily responsible for her episodes of syncope.  She has normal left ventricular systolic function by echocardiogram.  The minimal mitral valve prolapse noted is not clinically significant. There was no associated MR. Her thallium study is negative. There is no evidence of significant structural heart disease.

(R. 259).  Dr. Pinson recommended a low dose beta blocker medication and advised plaintiff to continue follow-up with Dr. Rasmussen.  (Id.).

On December 14, 2007 – four days before her follow-up appointment with Dr. Pinson – plaintiff filed the present applications for disability insurance benefits and supplemental security income, alleging that she became unable to work on November 3, 2007, due to "[h]eart problems and seizures."  (R. 88-104, 117).  She stated, "My symptoms come on me without prior notice. I have had serious seizures in my sleep, causing me to injure my tongue (from biting down on it).  Occasional moderate chest pains due to stress." She alleged that her illnesses first interfered with her ability to work during the summer of 2005 and that she became unable to work on November 3, 2007.  (R. 117).  Plaintiff stated that she saw Dr. Rasmussen as her primary care physician, Dr. Michael Pinson for heart problems and Dr. Sher Ghori for her seizure disorder. (R. 120). At the time of her application, she was not taking any medication for her illnesses or conditions. (R. 121).  She stated that she had completed twelfth grade in May 1982 and that she did not attend special education classes. (R. 122).  In a face-to-face interview conducted with plaintiff at the time of her application, the interviewer noted no problems with understanding, coherency, concentrating, talking, answering, using hands or writing.  (R. 138-39).  Plaintiff reported

5

past work as a hotel housekeeper, as a baker at a restaurant and as a de-boner at a chicken processing plant.  (R. 140-47).

On January 7, 2008, plaintiff completed a cardiovascular questionnaire.  She stated that she walks every other day for exercise, that she can walk one-half mile in forty-five minutes to an hour, and that she does not have chest or other discomfort with exercise. (R. 148).  She stated that she does have shortness of breath with lifting and with going up and down stairs, that she does not take medication for shortness of breath, and that she is not treated by a doctor for shortness of breath.  (R. 148-49).  In a physical activities questionnaire completed on the same day, however, she stated that sometimes she also has chest pains. (R. 150).  She indicated that she gets shortness of breath with walking, but she is able to stand for six hours, walk for forty-five minutes, and sit all day.  (R. 150).  Plaintiff stated that she must rest frequently because of shortness of breath when performing household chores, that her daughter cooks for her, and that someone else does her hair.  (R. 151-52).  She does not do yard work.  While she does shop, she gets shortness of breath if she walks "for a long time."  (R. 153).  She is unable to drive because of her seizures. (R. 154).  The daily activities form was signed by plaintiff but was completed by her cousin, Rita Lewis.  (R. 155).

On January 22, 2008, plaintiff reported to DDS that she had one seizure on November 3, 2007, and another seizure later in her sleep, but that she has not had any more seizures since that time.  She indicated that she has no prior history of seizures and that she was taking Tegretol.  She stated that she was also receiving treatment for heart problems.  (R. 156).  On

6

that same day, Dr. Jerry D. Jordan – a non-examining agency physician – reviewed plaintiff's records, including her cardiac workup, for the Disability Determination Services. He determined that plaintiff could perform light work "with hazard precaution." (R. 263). On January 29, 2008, plaintiff's daughter, Shakirah Crews, completed a seizure questionnaire. Crews indicated that plaintiff had seizures on November 3, 2007, and December 16, 2007, lasting forty-five minutes, that plaintiff had become unconscious during the seizures, and that she had bitten her tongue and found blood in her mouth after a seizure. Crews reported that plaintiff had jerking motions of her entire body but did not lose control of her bladder or bowels. After the attack, according to Crews, plaintiff felt "sleepy and weak." (R. 157). Crews reported that plaintiff experienced a side effect of chest pain from the seizure medication and stated that Dr. Ghori had switched plaintiff's medication from Tegretol to Trileptal. (R. 158).

Plaintiff's claims were denied initially on February 5, 2008. (R. 38-51). On February 22, 2008, plaintiff sought treatment from Dr. Madjid Keyvani, of Southeast Neurology, "for evaluation of memory impairment." (R. 285-86). Plaintiff reported that "she started having problems with her memory about a year ago," and "seems to have trouble with short-term memory." She also told Dr. Keyvani that, "[i]n November of 2007, she had some staring spells and passing out spells for which she was evaluated by Dr. Ghori who diagnosed her as having seizure disorder. He started Trileptal 600 mg twice a day and apparently, she has not had any spells." (R. 285). During that visit, plaintiff also complained of intermittent pain

in her left leg and left arm.  (R. 285).  On physical examination, Dr. Keyvoni noted no abnormalities of plaintiff's extremities and motor examination revealed normal strength of both upper and lower extremities.  (R. 286).  Plaintiff scored eighteen of thirty on a "Mini Mental State Examination."  Dr. Keyvani diagnosed cognitive impairment and seizure disorder.  He made no diagnosis regarding plaintiff's complaint of left leg and arm pain. With regard to the cognitive impairment, he wrote "I am not sure what her baseline was as she tells me she went to special school, and she probably has had some problems with her cognition to begin with."  (R. 286).

On February 28, 2008, plaintiff requested a hearing before an ALJ.  (R. 54-55).  In a disability report she completed in connection with her appeal, plaintiff stated that there had been a change in her condition since the earlier disability report completed on December 14, 2007.  She stated that she had experienced a seizure during her sleep, and that her tongue was bloody; she further indicated that her "memory is worse."  (R. 128).  She reported that she was seeing Dr. Madjid Keyvani due to her seizures, leg pain, finger numbness and memory. (R. 129).  She stated that she takes Trileptal for her seizures, and that she sleeps a lot due to the seizure medication.  (R. 131).  She indicated that she cannot read or watch television because her eyes get blurry, that she cannot go for walks anymore, and that her daughter has to fix her hair because plaintiff's arms get tired.  She does not cook because it is too dangerous – she does not know when she is going to have a dizzy spell and her left hand goes numb sometimes in the tips of her fingers.  She is unable to drive.  (R. 132).

On March 14, 2008, plaintiff returned to Dr. Keyvani for follow-up. She reported that she had "only one seizure since her last visit." Dr. Keyvani noted that plaintiff's EEG was "essentially unremarkable." Plaintiff had another Mini Mental State Examination on which she scored seventeen of thirty. Dr. Keyvani diagnosed "[c]omplex partial seizure with secondary generalization," and "[c]ognitive impairment with a baseline of learning disability." He prescribed Aricept "to see if that helps with her memory," and noted that plaintiff "will continue with Trileptal 600 mg twice a day." He scheduled her for follow-up in three months. (R. 289). Plaintiff next returned to Dr. Keyvani on May 6, 2008. She reported no seizures since the previous visit and "significant improvement in her memories and cognition" since starting on Aricept. Dr. Keyvani again diagnosed complex partial seizure with secondary generalization, "stable on Trileptal," and "[m]ild cognitive impairment with a baseline learning disability, improved with Aricept." (R. 290). He scheduled plaintiff for follow-up in four months. (R. 290).

When plaintiff next returned to Southeast Neurology, on December 10, 2008, she saw Dr. Saeeda Malik. (R. 291-93). Plaintiff reported no further seizures, no passing out and improved memory. She further indicated that she had "recently joined her work." Dr. Malik noted "[s]he is working in a hotel." (R. 291). Plaintiff scored twenty-eight out of thirty on the Mini Mental Status Examination. Dr. Malik observed that plaintiff's fund of knowledge was "good" and her recall was "3/3." Dr. Malik further noted plaintiff's "good" attention and concentration span, that she was "doing well" with regard to her seizures, and that her

problem with memory and concentration was "improved."  (R. 292).  She advised plaintiff to follow-up in three months.  (R. 293).

On March 5, 2009, plaintiff returned to Dr. Rasmussen for follow-up.  Dr. Rasmussen assessed benign hypertension and premature ventricular contractions. (R. 284).  He scheduled plaintiff for follow-up in six months.  (R. 284).  The following day, plaintiff had a 2-D echocardiogram, which Dr. Rasmussen reviewed and determined was "[ok]."  (R. 276-277).

Plaintiff returned to Dr. Malik on March 10, 2009.  Plaintiff returned to Dr. Malik for follow up.  Dr. Malik noted under "[h]istory" that plaintiff "was admitted to Medical Center in November of 2007 with seizure," and "was seen to have two episodes of seizure."  Dr. Malik wrote, "Per sister who was accompanied with the patient, she will sit and stare and she did that with the last seizure.  While eating, she stopped chewing that lasted for less than a minute with confusion. No associated tongue bite or loss of bladder control."  Plaintiff reported problems with her memory and intermittent chest pain.  (R. 294).  On mental status examination, Dr. Malik noted that plaintiff's fund of knowledge was "good."  Her recall was "3/3" and her attention and concentration span were "good." Her muscle tone bulk and strength were "normal 5/5 bilaterally."  Dr. Malik assessed "complex partial seizure with secondary generalization, last episode last week." "Problem with the memory and chest pain," "high blood pressure." Dr. Malik advised plaintiff to take a multivitamin daily, to continue with the Trileptal and to follow-up with her primary care physician for further evaluation of her chest pain.  (R. 295).

Plaintiff did so two days later, on March 12, 2009. She told Dr. Rasmussen that she had left-sided chest pain which radiated down her arm continuously since the previous Tuesday. She reported no nausea, vomiting or shortness of breath. Dr. Rasmussen noted that she "has had 2 negative stress tests in the past 3 years. Just had an Echocardiogram done that was normal." Plaintiff had an EKG that revealed [n]ormal sinus rhythm without abnormality." Dr. Rasmussen scheduled plaintiff for a Cardiolite graded exercise test the following day, which was a "[n]ormal hemodynamic and electrocardiographic exercise stress test" showing "[g]ood exercise tolerance." (R. 278-80).

Three months later, on June 10, 2009, plaintiff returned to Dr. Malik for follow-up. She reported no further seizures but complained of "problems in memory, concentration." She denied any chest pain or shortness of breath. (R. 296). Dr. Malik assessed "[p]roblem with memory and concentration" and "[c]omplex partial seizure with secondary generalization[,] [l]ast episode in early March." She advised plaintiff to continue on her Trileptal, continue her multivitamin, to follow-up in the Neurology Clinic in three months and to continue with seizure precaution, *i.e.,* "[n]ot to drive, not to deal with machinery, not to swim without supervision till seizure free for six months." (R. 297).

An ALJ conducted an administrative hearing on July 15, 2009. (R. 19-37). Plaintiff testified that her seizure medication makes her dizzy, but that it does control her seizures. (R. 24-25). The ALJ asked plaintiff if she were being treated for the dizziness, and she replied that she was not. (R. 26). At the hearing, plaintiff's attorney told the ALJ that ,while

plaintiff does have a twelfth grade education, the attorney thought it was "special education."

(R. 26). Plaintiff was wearing a brace on her left arm and told the ALJ that her arm hurt.

(R. 27). She stated that it was a "big throbbing" and that she has "tingling in [her] fingers."

She stated that this had been going on for "a couple of years." (R. 28). She rated her left arm

pain at a level "8," and stated that her arm pain this year is the same as it was the previous

year. (R. 29). Plaintiff testified that she is able to bathe and dress herself but that her daughter

helps her with housework, and that she does not cook. (R. 29). She is able to stand for about

one hour before she has to sit down and she can walk twenty feet before she has to stop and

sit down. (R. 31). Her daughter does her hair. Plaintiff estimated that she could lift and carry

"[a]bout 10 [pounds]." (R. 31). Plaintiff's attorney asked whether plaintiff's education was

"kind of special classes[,]" and plaintiff responded that it was. (R. 32-33). Plaintiff testified

that out of five days in a week, she would call in sick three to four days due to dizziness and

weakness. (R. 33).

The ALJ took testimony from a vocational expert, Jody Skinner. The VE testified that

plaintiff's task work as a housekeeper was medium and semi-skilled "with an SVP level of

three." In response to the ALJ's hypothetical question, the vocational expert testified that

an individual as described by the ALJ could not perform plaintiff's past relevant work but

could perform work as a garment bagger, cafeteria attendant, or garment folder. (R. 35-36).

The ALJ issued a decision on July 24, 2009. (R. 9-18). He concluded that plaintiff meets

the insured status requirements of the Social Security Act through December 31, 2011, and

that she has not engaged in substantial gainful activity since November 3, 2007, the alleged onset date. He found that she has severe impairments of complex partial seizures, chronic non-sustained ventricular ectopy, mitral valve prolapse, and cognitive impairment. (R. 11). He concluded that she does not have an impairment or combination of impairments that meet or medically equal one of the "listings." (R. 13). He found that she has the residual functional capacity to perform light work "except that she is unable to climb ladders, ropes, or scaffolds; is unable to tolerate concentrated exposure to extreme heat, extreme cold, humidity, fumes, odors, dust, gases, or poor ventilation; is unable to tolerate any exposure to hazards; and is moderately limited in concentration and memory." (R. 14). The ALJ concluded that, while she is unable to perform her past relevant work as a housekeeper, there are other jobs existing in significant numbers in the national economy that plaintiff can perform, such as garment bagger, cafeteria attendant, and garment folder. (R. 17-18). On March 18, 2010, the Appeals Council denied plaintiff's request for review. (R. 1-3). Plaintiff commenced the present appeal on May 10, 2010.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

In her appeal to this court, plaintiff argues that the ALJ's credibility finding is not based on substantial evidence and, further, that the ALJ committed "reversible error in failing to fully and fairly develop the record given the evidence of [plaintiff's] cognitive impairments and history of special education."  (Doc. # 12, p. 1).

### The ALJ's Duty to Develop the Record

Plaintiff contends that the evidence of her cognitive impairment and educational history gave rise to a duty on the part of the ALJ to obtain her school records and/or order a consultative psychological evaluation in order to assess her mental limitations. "[R]egardless of whether a claimant is represented by counsel, the ALJ 'has a duty to develop a full and fair record.'" George v. Astrue, 338 Fed. Appx. 803, 805 (11th Cir. 2009)(citing Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995)).  Remand is not required, however,

14

unless the administrative record as a whole is "inadequate or incomplete or 'show[s] the kind of gaps in the evidence necessary to demonstrate prejudice.'" <u>George</u>, 338 Fed. Appx at 805 (citing <u>Graham v. Apfel</u>, 129 F.3d 1420, 1423 (11th Cir. 1997)). "Even though Social Security courts are inquisitorial, not adversarial, in nature, claimants must establish that they are eligible for benefits. The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." <u>Ingram v. Commissioner of Social Security Administration</u>, 496 F.3d 1253, 1269 (11th Cir. 2007)(citing <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1281 (11th Cir. 2001)).

The evidence that plaintiff attended special education classes consists of: (1) her affirmative response to her attorney's question at the hearing about whether her classes were "kind of special classes" (R. 32-33); and (2) her statement to Dr. Keyvani on February 2, 2008, that she finished the twelfth grade in "special ed school" and that she is not able to do calculations or spelling. (R. 286). When she applied for benefits, however, plaintiff reported that she completed twelfth grade in May 1982 and, in response to a question about whether she had attended special education classes, she responded "No." (R. 122). The ALJ concluded that plaintiff "has at least a high school education[.]" (R. 17). He reasoned, in part, that "the claimant reports that she was in a special education program, but her assertion is not documented by any objective evidence." (R. 16). Plaintiff argues that the ALJ's duty to develop the record required "at a minimum" that he obtain plaintiff's school record. (Doc.

# 12, p. 8).

In assessing plaintiff's mental limitations, the ALJ further observed that plaintiff has "demonstrated a sustained history of at least semi-skilled work activity." (R. 16).  Plaintiff acknowledges that there is contradictory evidence in the record in this regard but contends, nevertheless, that the ALJ erred in reaching this conclusion because "the evidence is not entirely supportive of the ALJ's finding." (Id.)(citing R. 16).  In her disability report, plaintiff indicated that she had worked as an "Asstnt Supervisor/Housekeeper;" that this job required that she write and complete reports and use machines, tools, or equipment; that she spent "100%" of her time supervising six other workers; and that she was a "lead worker." (R. 118-19). The VE testified the plaintiff's past work as a housekeeper was medium and semi-skilled with an SVP level of three.  (R. 35).

The evidence that plaintiff worked as a supervisor, her description of her job requirements, and the VE's testimony provide substantial evidentiary support for the ALJ's conclusion that plaintiff performed semi-skilled work activity. Additionally, even assuming that the ALJ erred in finding that plaintiff had "at least a high school education," any error in this regard is harmless. The ALJ's hypothetical questions to the vocational expert – who was present for plaintiff's testimony that she had attended "kind of special classes" – included "[m]oderate mental limitations *having to do with limited education* and some memory problems."  (R. 35)(emphasis added).  Upon questioning by plaintiff's attorney, the vocational expert testified that the jobs that she had identified in response to the ALJ's

hypothetical question would not be precluded by additional limitations of "inability to calculate or spell" (R. 36), the limitations attributed by Dr. Keyvani to plaintiff's special education. (R. 286). The evidence of record includes sufficient evidence to permit the ALJ to make an informed decision on plaintiff's claims of disability and, accordingly, he did not err by failing to further develop the record.

### The ALJ's Credibility Determination

Plaintiff next challenges the ALJ's credibility determination. She contends that the ALJ erred by failing to credit her testimony regarding: (1) side effects of her medication and (2) her chronic left arm pain. Plaintiff testified at the hearing that she is unable to work because of dizziness and drowsiness she experiences from taking her seizure medication. (R. 24-25). In her disability appeal report, she stated that she sleeps a lot from the medication she takes for seizures and has dizzy spells. (R. 132). Plaintiff also testified that she has arm pain at a level of "8" that has persisted for a couple of years. (R. 28). The ALJ rejected plaintiff's complaint of side effects from her seizure medication stating, "[i]f the claimant were as limited by medication side-effects as she claims, she would presumably have sought adjustment of the dosage or requested alternative treatment. There is no indication that the claimant has ever reported any problems with side-effects to any of her physicians, and her allegations of side-effects appear to be self-serving and embellished." (R. 15). With regard to plaintiff's testimony regarding significant chronic left arm pain, the ALJ observed that she "has not provided any medical evidence suggesting that she has ever sought treatment for any

left arm impairment, or that any such impairment has ever been diagnosed. There is no objective evidence substantiating any impairment of the left arm."  (R. 16).

As to the side effects of medication, plaintiff cites evidence of record that "common side effects" of Trileptal include dizziness, drowsiness and fatigue, citing the pharmacy printout for plaintiff's prescription. (Doc. # 12, p. 11)(citing R. 160). She notes that the record containing Dr. Ghori's office notes – which cover the period through December 5, 2007 – appear to be incomplete because pharmacy records demonstrate that plaintiff had prescriptions for Tegretol filled on December 26, 2007, and for Trileptal filled on January 29, 2008, both prescribed by Dr. Ghori.  (R. 159-60).  Plaintiff points to the questionnaire completed by her daughter on January 29, 2008 indicating that Dr. Ghori switched plaintiff's medication from Tegretol to Trileptal.  (Doc. # 12, p. 11)(citing R. 158). She complains that the ALJ did not ask her whether she ever discussed the medication side effects with her physicians.  (Doc. # 12, p. 11).  With regard to her complaints of severe pain in her left arm, plaintiff notes that she "did present to her treating physician, Dr. Keyvani, on February 22, 2008, with complaints of pain in her left arm and left leg."  (Doc. # 12, p. 12)(citing R. 285).

Notably, plaintiff does not suggest that she complained to Dr. Ghori that her present seizure medication – Trileptal – causes dizziness and drowsiness, the allegations on which she bases her claims of disability.  In the seizure questionnaire plaintiff cites, her daughter wrote that Dr. Ghori prescribed Tegretol for plaintiff's seizures and noted only that it had a side effect of "chest pain."  (R. 158). She attaches evidence that she filled prescriptions for

18

Tegretol on December 26, 2007 (R. 159), and that she filled the prescription for Oxcarbazepine (Trileptal) on January 29, 2008 (R. 160), the same day that she completed the questionnaire (R. 157). At most, this evidence suggests that plaintiff may have complained to Dr. Ghori of chest pain resulting from the Tegretol and that, only one month after plaintiff started the Tegretol, Dr. Ghori changed plaintiff's prescription to Trileptal in response to her complaint of chest pain. It does not raise any implication that plaintiff, thereafter, complained to Dr. Ghori of dizziness and drowsiness caused by the Trileptal. Additionally, the plaintiff bears the burden of establishing disability and, if there are missing treatment notes showing that plaintiff complained to any of her physicians of significant side effects from her present seizure medications, plaintiff should have provided those records to the ALJ. The ALJ had no obligation to procure plaintiff's medical records for the period following December 14, 2007, the date on which plaintiff filed her applications for benefits. See McCloud v. Barnhart, 166 Fed.Appx. 410 (11th Cir. 2006); Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003)(Commissioner is required to develop the record for the twelve months preceding the application filing date but not for the period after the application is filed).

Also, while there is evidence that plaintiff has been on Trileptal since as early as January 29, 2008 (R. 160), in an office visit on March 5, 2009, Dr. Rasmussen noted no medication side-effects. (R. 284). Plaintiff's Southeast Neurology treatment records contain no indication that plaintiff reported medication side effects. (Exhibit 9F). On June 10, 2009, one month before the administrative hearing, Dr. Malik noted, "Currently she takes Trileptal

19

600 mg twice a day. No further seizure. She denied any side effect from medication."
(R. 296). Accordingly, the ALJ did not err by failing to ask plaintiff whether she had,
contrary to the reports of her physicians, complained of side effects from her Trileptal.

With regard to her complaints of severe left arm pain, plaintiff points to evidence of
record showing that she did, indeed, complain of left arm and left leg pain to Dr. Keyvani on
February 22, 2008. (Doc. # 12, p. 11)(citing R. 285). However, the reason for the office visit
on that date was plaintiff's complaint of "[m]emory loss." Dr. Keyvani mentions plaintiff's
arm pain only in passing, under "Review of Systems," stating, "All other systems are normal,
although she complains of pain in left leg and left arm, which is intermittent." (R. 285).[1] On
examination, Dr. Keyvani noted no abnormalities with regard to plaintiff's extremities and
observed normal strength to direct testing of her extremities. Dr. Keyvani made two
diagnoses: seizure disorder and cognitive impairment. He diagnosed no impairment of
plaintiff's left arm. (R. 286). Plaintiff argues that "it appears [plaintiff] was trying to convey
to the ALJ that Dr. Keyvani had performed some type of tests, such as a nerve conduction
study, on her left arm when she testified that Dr. Keyvani, 'he did, watch you call it, shocking
and sticking needles in your arm to stop, try to stop the pain but he told me to get the brace
and wear it in case it don't stop.'" (Doc. # 12, p. 12)(citing R. 27-28). Plaintiff contends that
the ALJ erred by failing to ask plaintiff to expand on that statement by inquiring what type

---

[1]   In the disability report she completed for purposes of her appeal from the initial
unfavorable determination, plaintiff failed to mention any treatment by Dr. Keyvani for arm pain.
Instead, she indicated that she had seen Dr. Keyvani on February 21, 2008 for "seizure, leg pain,
finger numbness, [and] memory." (R. 129).

of testing was performed or if Dr. Keyvani had given her a diagnosis as to what was causing her arm pain.  (Id.).

Plaintiff testified that this treatment took place "[w]hen Dr. [Keyvani] was there." (R. 27).  The record before the ALJ included detailed treatment notes documenting plaintiff's treatment at Southeast Neurology, Dr. Keyvani's practice, through June 10, 2009.  (Exhibit 9F).  According to those notes, plaintiff last saw Dr. Keyvani on May 6, 2008.  (R. 290).  The next treatment note is for plaintiff's office visit on December 10, 2008, with Dr. Malik, who described plaintiff as "a former patient of Dr. Keyvani."  (R. 291).  In the last Southeast Neurology treatment note of record – for plaintiff's June 10, 2009 visit – Dr. Malik advised plaintiff to follow up in three months.  (R. 297).  Plaintiff's administrative hearing took place on July 15, 2009, only a month after her June 10, 2009, appointment with Dr. Malik.  Thus, it appears that Exhibit 9F was current at the time of the hearing.  The exhibit evidences no further complaints by plaintiff of arm pain, no documentation of any testing of any sort on plaintiff's left arm (by either Dr. Keyvani or Dr. Malik), and no diagnosis of any impairment of plaintiff's left arm.  (See Exhibit 9F).  If such evidence existed, plaintiff's counsel could have asked the ALJ to keep the record open to receive it; however, she did not.  (R. 36-37). While plaintiff testified that her arm pain had been at the same level – a level  of "8" – for two years, her neurology treatment notes do not reflect that she mentioned arm pain at any time other than to Dr. Keyvani on the single instance referenced in the treatment note of February 22, 2008.

The reasons articulated by the ALJ for declining to credit plaintiff's testimony of disabling side effects from her seizure medication and of severe left arm pain are both adequate and supported by substantial evidence of record. Plaintiff's argument to the contrary is without merit.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and, therefore, that it is due to be affirmed. A separate judgment will be entered.

DONE, this 15th day of July, 2011.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

22